**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**TERRIELL PETERS,**

**Plaintiff,**

v.

Case No: 1:26-cv-8092

**EQUIFAX INFORMATION SERVICES, LLC,**

**JURY TRIAL DEMANDED**

**Defendant.**

## COMPLAINT

Plaintiff, Terriell Peters ("Plaintiff"), by and through the undersigned counsel, complains, states, alleges, and asserts against Defendant, Equifax Information Services, LLC ("Equifax"), as follows:

## PRELIMINARY STATEMENT

1. This is an action for damages brought by Plaintiff against Defendant Equifax for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA").

## JURISDICTION AND VENUE

2. Jurisdiction arises under the FCRA, 15 U.S.C. § 1681p.

3. Equifax is subject to the provisions of the FCRA and is subject to the jurisdiction of this Court.

4. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

5. Plaintiff is a natural person and a citizen of the State of New York, residing in Bronx, New York.

6. Plaintiff is a "consumer" as that term is defined by the FCRA, 15 U.S.C. § 1681a(c).

7. Equifax is a Georgia limited liability company, with a principal business address of 1550 Peachtree St NW, Atlanta, GA 30309.

8. Equifax is registered to conduct business in the State of New York, where its registered agent is Corporation Service Company, 80 State Street, Albany, NY 12207.

9. Equifax is a nationwide Consumer Reporting Agency ("CRA") within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that, for monetary fees, dues, and/or on a cooperative nonprofit basis, it regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically the mail and internet. As a CRA, Equifax is aware of its obligations under the FCRA.

## FACTUAL ALLEGATIONS

10. Equifax, Experian, and TransUnion (collectively, the "CRAs") are the three major consumer reporting agencies in the United States, and regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

11. The reports of CRAs generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

12. The CRAs obtain consumer information from various sources. Some consumer information is sent directly to the credit reporting agencies by furnishers, and other information is independently gathered by credit reporting agencies from third party providers, vendors, or repositories, like computerized reporting services like PACER and Lexis-Nexis.

13. The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from credit reporting agencies to make lending decisions.

14. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRAs' consumer reports.

15. Accounts with negative information is the biggest factor use in FICO Scores, and consumers with negative information on their credit reports likely have lower credit scores than consumers who have no negative information.

16. The information credit reporting agencies include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

17. FICO Scores are calculated using information contained in the consumer's report.

18. FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

19. FICO Scores factor in the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

20. "Payment history" refers to whether a consumer has paid her[er] or her[er] bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

21. The "amount of debt" a consumer owes has a major impact on their credit score. When a credit reporting agency reports a debt as outstanding when it is in fact discharged, the credit reporting agency indicates that a consumer's "amount of debt" is

higher than it actually is, which will undoubtedly impact a consumer's credit score.

22. Lenders also consider a consumer's debt-to-income ratio before deciding to extend credit or approve financing terms.

23. Banks, landlords, credit card issuers, employers, insurance companies, utility providers, among others, all use credit scores to assess how likely a consumer is to make timely payments. A higher credit score leads to better loan terms and lower interest rates, while a lower credit score leads to worse loan terms, higher interest rates, and/or credit denials.

24. Debt-to-income compares the total amount a consumer owes to the total amount a consumer earns.

25. A consumer's income, however, is not included in their consumer report; only their amount of debt is.

26. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's debt-to-income will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest and lower credit limits).

27. According to data provided by the Consumer Financial Protection Bureau ("CFPB"), consumer complaints about credit reporting and debt collectors attempting to collect money not actually owed by the consumer are by far the most common of all complaints received by the Bureau every year.

28. The impact of debt and debt collection is not just financial. In fact, the Federal Reserve Bank of Atlanta published a study, which was the joint collaboration of

economists Laura Argys, Andrew Friedson, and Federal Reserve economist M. Melinda Pitts, that directly linked financial strain from higher debt levels to higher death rates among American consumers.[1] The study also found, the impact of delinquency is most pronounced in the short-term as individuals are far more likely to die as a result of an immediate debt shock than in response to lingering debt.[2] As part of the study, the economists analyzed credit balance and delinquency data maintained by the Federal Reserve.[3] The results, while not surprising, showed that individuals with bad credit and higher amounts of delinquent debt, had a higher probability of death than those with better credit and smaller amounts of delinquent debt.[4]

29. In fact, on January 17, 2025, the CFPB entered into a consent order with Equifax, finding Equifax violated FCRA by, among other things: i) failing to properly conduct reinvestigations of disputed information in consumer files; ii) failing to prevent the improper reinsertion of previously deleted information from consumer files; iii) failing to provide adequate written notice to consumers of the results of its reinvestigations; iv) failing to follow reasonable procedures to assure maximum possible accuracy of information Equifax reports on consumers; and v) failing to block reporting of information consumers identified as resulting from identity theft and to provide appropriate notice when such blocks were declined or rescinded.[5]

---

[1] Laura M. Argys, Andrew Friedson, & M. Melinda Pitts, *Killer Debt: The Impact of Debt on Mortality*, FRB Atlanta Working Paper No. 2016-14 (2016).
[2] *Id*. at 14.
[3] *Id*. at 3.
[4] *Id*. at 4.
[5] https://www.consumerfinance.gov/enforcement/actions/equifax-inc-and-equifax-information-services-llc/

30. The CFPB also found, Equifax engaged in unfair acts or practices by: (1) using ineffective systems, flawed processes, and excessive deference to furnishers to resolve consumer disputes and failing to adequately inform consumers of the results of reinvestigations; and (2) selling inaccurate consumer credit scores and credit attributes after it introduced "test code" into a production environment in a scoring model server.[6]

31. On or about July 8, 2026, Plaintiff requested and obtained a copy of his consumer credit disclosure from Equifax, bearing Confirmation No. 6189531734 (the "Equifax Disclosure").

32. Pursuant to 15 U.S.C. § 1681g(a), upon receipt of Plaintiff's request, Equifax was required to "clearly and accurately" disclose all information in Plaintiff's file at the time of his request.

33. The Equifax Disclosure identified, among other tradelines, the following eleven accounts expressly designated by Equifax as a "Debt Buyer Account" (collectively, the "Debt Buyer Tradelines"): (1) PORTFOLIO RECOVERY ASSOC, account number ending in 6042, balance $1,219 (the "PRA Account"); (2) LVNV FUNDING LLC, account number ending in 6938, balance $778 (the "LVNV Account 1"); (3) LVNV FUNDING LLC, account number ending in 8270, balance $619 (the "LVNV Account 2"); (4) LVNV FUNDING LLC, account number ending in 4570, balance $713 (the "LVNV Account 3"); (5) LVNV FUNDING LLC, account number ending in 2537, balance $111 (the "LVNV Account 4"); (6) LVNV FUNDING LLC, account number ending in 8503, balance $1,444

[6] *Id.*

(the "LVNV Account 5"); (7) LVNV FUNDING LLC, account number ending in 5548, balance $937 (the "LVNV Account 6"); (8) LVNV FUNDING LLC, account number ending in 7164, balance $2,309 (the "LVNV Account 7"); (9) LVNV FUNDING LLC, account number ending in 4587, balance $544 (the "LVNV Account 8"); (10) LVNV FUNDING LLC, account number ending in 0664, balance $2,440 (the "LVNV Account 9"); and (11) LVNV FUNDING LLC, account number ending in 9083, balance $417 (the "LVNV Account 10").

34. Debt buyers, including Portfolio Recovery Assoc and LVNV Funding LLC, are companies whose primary business is the purchase and collection of debts originally owed to third parties. Debt buyers are never themselves the Original Creditor of an account.

35. The Equifax Disclosure classifies the Debt Buyer Tradelines each as a "Debt Buyer Account," indicating that Portfolio Recovery Associates, LLC and LVNV Funding LLC tradelines are not, and can't be, the original issuer of the respective alleged debts.

36. Despite this, the Equifax Disclosure failed to identify the Original Creditor for any of the eleven Debt Buyer Tradelines anywhere within the disclosure provided to Plaintiff.

37. The Equifax Disclosure thus shifts the burden of identifying the true original creditor for the Debt Buyer Tradelines away from itself and onto Plaintiff.

38. The Credit Reporting Resource Guide, published by the Consumer Data Industry Association, a trade association representing the CRAs, including Equifax, states that "[t]he purpose of reporting the original creditor name is to help consumers identify the source of accounts when they appear on credit reports[; w]ithout the original creditor

names, consumers may not know what the accounts represent." The Credit Reporting Resource Guide further instructs furnishers to "[r]eport the name of the company/creditor that originally opened the account for the consumer."

39. Further, pursuant to a 2000 FTC Opinion Letter (Advisory Opinion to Darcy, June 30, 2000), a consumer reporting agency that fails to clearly and accurately disclose all information in a consumer's file, including the identity of the original creditor, does not technically comply with Section 609 of the FCRA, 15 U.S.C. § 1681g.

40. Upon information and belief, Portfolio Recovery Assoc and LVNV Funding LLC complied with the Credit Reporting Resource Guide and reported the name of the true original creditor of their respective accounts to Equifax.

41. Equifax's omission of the original creditor's name from its disclosure of the Debt Buyer Tradelines deprived Plaintiff of information necessary to identify the source of the alleged debts and verify their validity, in violation of 15 U.S.C. § 1681g(a)(1).

42. The Equifax Disclosure identifies the PRA Account and LVNV Accounts 1 through 10 only by truncated account numbers, ending in 6042, 6938, 8270, 4570, 2537, 8503, 5548, 7164, 4587, 0664, and 9083 respectively, omitting the full account numbers.

43. Upon information and belief, Portfolio Recovery Assoc and LVNV Funding LLC reported the full account numbers associated with their respective accounts to Equifax, and that information was contained within Equifax's file regarding Plaintiff at the time of his request.

44. When Equifax produces and sells consumer reports regarding Plaintiff to third parties, full account numbers for tradelines such as the PRA Account and LVNV Accounts 1 through 10 are included in those reports.

45. The completeness of Equifax's third-party reports demonstrates its ability to comply with 15 U.S.C. § 1681g(a) in disclosing the full contents of Plaintiff's file directly to the third-party.

46. Having a duty to disclose all information regarding the PRA Account and LVNV Accounts 1 through 10 contained in Plaintiff's file, Equifax breached that duty by truncating the account numbers — information necessary for Plaintiff to research and evaluate the alleged debts.

47. *The failure to disclose the full account number violates the FCRA's requirement that a CRA disclose all information contained in a consumer's credit file clearly and accurately. See Washington v. Equifax, Case No. 3:19-cv-00154 (M.D. Tenn. Jun. 12, 2019) ("The plain language of the FCRA requires that the consumer reporting agency shall clearly and accurately disclose to the consumer '[a]ll information in the consumer's file at the time of the request.' 15 U.S.C. § 1681g. In the absence of binding authority stating that a truncated account number is a clear and accurate disclosure, the Court finds that Plaintiff has stated a plausible claim for a violation of Section 609 of the FCRA.").*

48. Equifax's incomplete disclosure caused Plaintiff a concrete and particularized injury. Because Equifax omitted the original-creditor and other account-identifying information, Plaintiff was unable to identify the source of the alleged debts and

meaningfully investigate and evaluate whether the accounts belonged to him and were valid. Plaintiff was required to expend additional time and effort attempting to identify and understand the accounts and experienced frustration and concern as a result.

49. The failure of an entity to provide accurate and truthful information as required by law creates an injury-in-fact, thus creating standing pursuant to Article III. *See*, e.g., *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) (holding alleged injury to a plaintiff's statutorily created right to truthful information was a cognizable injury in and of itself, satisfying the Article III requirement of injury in fact).

50. Further, pursuant to a 2000 FTC Opinion Letter (Advisory Opinion to Darcy, June 30, 2000), "it is our view that a CRA that always scrambles or truncates account (or social security) numbers does not technically comply with Section 609 because it does not provide 'accurate' (and perhaps not 'clear') disclosure of 'all information' in the file."

51. Equifax's omission of the original creditor and the full account numbers on the Debt Buyer Tradelines greatly decreased Plaintiff's ability to understand the disclosure, identify the accounts, and evaluate the alleged debts.

52. Additionally, despite coding the PRA Account and LVNV Accounts 1 through 10 as Collection Accounts ("C") in their payment history for the months reviewed, Equifax left the summary "Status" field blank for all eleven accounts in the Equifax Disclosure — further evidence that Equifax withheld information its own systems contained.

53. The CDIA's Credit Reporting Resource Guide further states that the "Date Opened" should be the open date of the account with the Original Creditor for accounts reported by debt buyers.

54. Despite the foregoing, the Equifax Disclosure does not disclose the open date of the account with the Original Creditor for the Debt Buyer Accounts. Instead, the Equifax Disclosure reports a different date, which is unknown to Plaintiff, even though Equifax has the accurate open date of the account with the Original Creditor in Plaintiff's credit file.

55. Reporting the Debt Buyer Accounts as Credit Accounts and failing to report the name of the Original Creditor, accurate accounts numbers, and accurate open dates for the Debt Buyer Accounts renders the Equifax Disclosure inaccurate and/or misleading.

56. Further, upon reporting of the Debt Buyer Accounts, Plaintiff's Equifax credit score was negatively impacted a second time underscoring that Equifax's credit scoring algorithm treats the Debt Buyer Accounts as "Credit Accounts," because the algorithm understood the Debt Buyer Accounts as a new negative tradeline versus a collection account from the Original Creditor.

57. The foregoing practices cause consumers' credit scores to be depressed, making it more difficult for consumers to obtain credit and causing higher borrowing costs, netting lenders more money, as well as Equifax because Equifax makes money, in part, by selling credit reports and data Equifax collects to lenders. Therefore, when a

consumer's credit score is depressed, like Plaintiff's here, a consumer is forced to engage with multiple lenders, netting Equifax more money.

58. Upon information and belief, the Equifax Disclosure to Plaintiff was generated using a standardized template that Equifax applies to consumer disclosures on a nationwide, systemic basis, resulting in the same Original Creditor omission for similarly situated debt buyer tradelines across its consumer disclosures generally.

59. Equifax has known of this omission for years but has failed to correct it, despite the substantial number of consumers likely affected.

60. The lack of accurate, complete information caused Plaintiff frustration and concern when trying to understand and verify his credit disclosure.

61. Negatively impacting Plaintiff's Equifax credit score a second time upon reporting of the Debt Buyer Accounts subjected Plaintiff to a higher risk of death.

62. Plaintiff has hired the undersigned counsel to represent him in this matter and has assigned to the undersigned counsel the right to obtain reimbursement of reasonable fees and costs.

63. Equifax has a pattern and practice of engaging in the same or similar conduct as described in this Complaint.

## FIRST COUNT
## WILLFUL VIOLATION OF 15 U.S.C. § 1681g(a)(1)

64. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

65. Equifax willfully violated 15 U.S.C. § 1681g(a)(1) by failing to clearly and accurately disclose to Plaintiff, a consumer, all information in his file at the time of his request, specifically by omitting the name of the original creditor, the full account numbers, and the account status for the PRA Account and LVNV Accounts 1 through 10.

66. Equifax knowingly and recklessly disregarded its statutory obligation to provide Plaintiff a complete and accurate disclosure, notwithstanding its awareness of this recurring omission across its consumer disclosures.

67. As a direct and proximate result of Equifax's willful violation, Plaintiff suffered damages, including frustration and difficulty understanding and verifying the information in his credit file.

68. Equifax is therefore liable to Plaintiff pursuant to 15 U.S.C. § 1681n, for the greater of Plaintiff's actual damages and statutory damages of up to $1,000 per violation, plus punitive damages, attorney's fees, and costs.

## SECOND COUNT
## NEGLIGENT VIOLATION OF 15 U.S.C. § 1681g(a)(1)

69. Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

70. In the alternative, Equifax negligently violated 15 U.S.C. § 1681g(a)(1) by failing to clearly and accurately disclose to Plaintiff all information in his file at the time of his request, specifically by omitting the name of the original creditor, the full account numbers, and the account status for the PRA Account and LVNV Accounts 1 through 10.

71. As a direct and proximate result of Equifax's negligence, Plaintiff suffered actual damages.

72. Equifax is therefore liable to Plaintiff pursuant to 15 U.S.C. § 1681o, for Plaintiff's actual damages, attorney's fees, and costs.

## JURY DEMAND

73. Plaintiff hereby demands a trial of this action by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment be entered as follows:

a. Finding Equifax's actions violate the FCRA; and
b. Awarding damages to Plaintiff pursuant to 15 U.S.C. § 1681n and/or § 1681o; and
c. Awarding Plaintiff's attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and/or § 1681o(a)(2), calculated on a "lodestar" basis; and
d. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2); and
e. Awarding the costs of this action to Plaintiff under the FCRA; and
f. Awarding pre-judgment and post-judgment interest to Plaintiff; all together with
g. Such other and further relief that the Court determines is just and proper.

Dated: September 17, 2026

Respectfully submitted,

**RUDY LAW FIRM™**

*By: /s/ Joseph E. Rudy*
Joseph E. Rudy, Esquire
75 S. Broadway, Fourth Floor
Suite 431
White Plains, New York 10601
Tel: (914) 627-9300
Fax: (212) 947-8006
jrudy@josephrudylaw.com
*Attorney for Plaintiff*